## Case No. 10;961a.

PENT et al. v. TWO THOUSAND EIGHT HUNDRED AND FIFTY DOLLARS.[1]

District Court, S. D. Florida. July, 1880.

SALVAGE—CONTRACTS OF CONSORTSHIP—LICENSED WRECKERS—DISTRIBUTION OF SALVAGE MONEY.

[1. Contracts of consortship, if within reason, will be sustained when fully proven, but the burden of proof is upon him who sets up an agreement materially changing the rights of salvors, and excluding, without just cause, any one who took part in rendering the service from sharing in the salvage award. *Held*, therefore, that where an alleged contract was set up, which was contrary to all principles of dividing salvage, but the evidence was insufficient to show a common understanding at the time it was entered into as to the terms thereof, the same would be disregarded, and the salvage money divided according to the established rules.]

[2. The law requiring vessels engaged in wrecking on the coast of Florida to have a wrecking license justifies the exclusion of unlicensed vessels from participating in a salvage service, and sharing in the award therefor, only when licensed vessels are present which are capable of rendering the required services, and if the services of unlicensed vessels are accepted, they are entitled to share in the compensation.]

[3. Where salvage services were rendered wholly by the crews of the vessels present, the vessels themselves being unable, from the peculiar circumstances, to participate therein, and being also in the aggregate of only 16 tons of

[1] [Not previously reported.]

measured tonnage. *held*, that the usual rule, giving one-half to the vessels and one-half to the men, should be varied, and that only two-fifths should be given to the vessels, and the other three-fifths divided among the crews.]

[This was a libel by Anthony Pent and others against $2,850 in the hands of William D. Cash.]

L. W. Bethel, for libellants.

W. C. Maloney, for respondents.

LOCKE, District Judge. The prayer of the libellants is based upon an alleged verbal contract made at the time of rendering salvage service to the Br. S. Benmore, by which it is claimed that only the licensed vessel, the Gleason, was to share in the salvage, and she was to receive as much per ton as the men received per share, and that the other boats were to receive nothing. This contract as alleged would be contrary to all principles of dividing salvage earnings, and could only be sustained by direct and conclusive evidence. Contracts of consortship, if within reason, will be sustained when fully proven, but the burden of proof is upon him who sets up an agreement which materially changes the rights of parties engaged, and excludes from a share of salvage any one without just cause. In regard to such consortship, the law is well established that they are binding only so far as they are reasonable and just, and deprive no party of a fair share of whatever is earned. The duty of protecting the weak or ignorant against the strong or cunning, or those who from some temporary advantage attempt to make hard bargains, justifies courts of admiralty in going back of such bargains, if necessary for such purpose. If they supply a rule which is just and fair; and nearly such as the court itself would be disposed to adopt, they are carried into effect; otherwise not. The Beulah, 1 W. Rob. Adm. 477; The Louisa, 2 W. Rob. Adm. 22; Marv. Wrecks & Salv. 241, 251.

In this case four parties have testified to this agreement, all directly interested in the result of the division and benefited by one according to their understanding. A. J. Pent says: "Capt. Smith made the proposition of consortship, that the Gleason was to draw her tonnage, but the money was to be divided into shares, and she was to draw a share for a ton. He said no vessel should draw unless she was licensed, and that the Gleason was the only one that had a license. The balance of the boats were to be counted out." John Saunders says: "Capt. Smith made consortship. He said all licensed vessels would draw their tonnage. Their tonnage would be this, they would draw a share to each ton. So to the share so to the ton. I heard nothing said about the men and boats." Capt. Smith says: "I told them the steamer was given up to me to get off, and said, 'Gentlemen, you that are licensed will get your tonnage, and you that are not will get your shares.' I meant their shares, and not their

boats. I did not say that the shares should be arrived at by dividing the net amount into shares, and 'as it was to the share so should it be to the ton.' I did not say that the Gleason, being the only licensed vessel, should draw her tonnage. I thought the Eugene had a license. Her master told me she had. I never agreed that the Gleason should receive a share to a ton." Jeremiah W. Pinder says: "Capt. Smith agreed to take in all the vessels of 5 tons; did not say anything about men. The agreement was 'all boats not 5 tons cannot come in'; that is as near as I can recollect it. Did not hear a word said about how the money was to be divided. I considered my vessel was to come in and earn salvage, as she was over 5 tons. I never agreed that my vessel should not draw salvage. I heard all that was said that night. 1 did not hear any one say anything at all that night about a license. If anything had been said I should have known it." In this condition of proofs, it is impossible to determine what the agreement of consortship was. Pent and Saunders say that nothing but the Gleason was to share, she being the only licensed vessel, but she was to receive but a share per ton. Smith admits that only the licensed vessels should share, but denies that he agreed to accept a share per ton; but, as he claims, the contract was she was to receive one-half of the entire salvage no other vessel receiving anything, although at the time he says he believed one of the vessels had a license, although Pent and Saunders say that at the time he said that he, being the only licensed vessel, would be the only one to share. Pinder, although present at the time and hearing all that was said, says nothing was said about licensed vessels that night, and he had no idea but what his vessel was to share.

In order that there may be a valid contract, there must be some common ground of understanding, some mutual yielding until a point is reached where the interest and understanding of each party is similar as to the force and effect of the agreement. Each of the witnesses was a party to the alleged contract, and the most generous construction that can be put upon the matter is that there was no common ground of understanding or interest between them; that either the surrounding circumstances, or the terms of the would be contract were so vaguely and indefinitely set forth that no two of them got the same idea of what it meant, and each went away with a view that a bargain most favorable to himself and those of his class had been made. This seems to have been the facts from the testimony, and the circumstances would certainly tend to show that such contract as claimed by Capt. Smith would have been most arbitrary and unjust to many of those who are claimed to have accepted it without the least compensating circumstances in return. Capt. Smith, with but two men, had received permission to get the steamship afloat for a certain amount. He was perfectly helpless. The labor was to be performed by discharging cargo, where vessels or boats could not assist. In order to do anything, it was absolutely necessary that he should have assistance; and that at that time he should force the stipulation that his vessel, while doing nothing, should receive one-half of the salvage money, while no others were to receive anything, and that the other masters, knowing how dependent he was upon them for assistance, should accept such propositions, seems, to say the least, unreasonable. I cannot understand that this could have been the case. On the other hand, there is not evidence enough to satisfy me that they had agreed to divide. Pent and Saunders say a share to the ton, and I am satisfied that the common understanding necessary to a valid contract was entirely wanting in this case; and it therefore devolves upon the court to order such division as may be just, according to the established rules of this court and the circumstances of the case. The requirements of law compelling all vessels engaged in wrecking on this coast to have a wrecking license, although intended to prevent other vessels from engaging in wrecking, and justifying their exclusion when there are other vessels licensed, and also justifying the court in making reasonable discrimination in favor of the licensed vessels when demanded, do not prohibit a compensation to others when, being present, their services come into requisition, and they render valuable aid. It is only when licensed vessels are present capable of rendering the required services that unlicensed ones can be excluded, and if they are accepted, they are entitled to compensation. The relation existing between the vessels of any class and their crews is so intimate that nothing except the most unusual services will justify either crew or owner in attempting to exclude the other from a share of any earnings. The question of the portion of salvage money that is given separately to the vessels and crews in this court, although usually settled by rule so as to apply to all ordinary cases in a fair and just manner, may be varied or changed when justice may require it, or a superabundance of either tonnage or men would render such a variation necessary to give just compensation to either.

This is an unusual case. The large number of men present,—nearly 60,—with only 16 tons of measured tonnage, enabled the vessels to earn without any use of them what will under any circumstances be liberal compensation, yet without doubt the presence of a licensed vessel influenced the master of the Benmore to accept the assistance he did. I consider the circumstances will justify something of a variation from the rule of the court which gives one-half to the men. Two-fifths will, I consider, compensate the vessels present as amply as the remaining three-fifths will the men. There is no reason why all

vessels whose men were engaged should not share. None rendered any service except providing men, and all did this equally. The Gleason, Irene, and Eugene being the only vessels of measured tonnage, they will share from the vessels two-fifths according to their tonnage. The smaller boats each receive an amount equal to a man's share. The three-fifths will be divided among the men, giving Smith, the master of the Gleason, the only licensed vessel, four shares as master wrecker, all others one share each.